UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KIRKLAND HUGHES                                   CIVIL ACTION

VERSUS                                             NO. 24-1581

NEW ORLEANS PUBLIC BELT                           SECTION M (5)
RAILROAD COMMISSION FOR THE
PORT OF NEW ORLEANS

### ORDER & REASONS

Before the Court is a motion for summary judgment filed by defendant the New Orleans Public Belt Railroad Commission for the Port of New Orleans (the "NOPB").[1] Plaintiff Kirkland Hughes responds in opposition,[2] and the NOPB replies in further support of its motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court denies the motion because there are disputed issues of material fact that preclude summary judgment.

**I.    BACKGROUND**

The present action is a claim for damages under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60, arising out of Hughes's allegation that he sustained a shoulder injury at work as a result of the negligence of the NOPB, his employer at the time.[4] Hughes claims that the NOPB breached its duty under FELA to provide him with a reasonably safe work environment when it required him to manually operate the kind of hydraulic switch machine about which employees had previously complained.[5]

---

[1] R. Doc. 42.
[2] R. Doc. 43.
[3] R. Doc. 44.
[4] R. Doc. 43 at 1.
[5] *Id.*

Hughes is a railroad switchman who has worked for the NOPB since 2003.[6] On the morning of May 17, 2023, Hughes, engineer Charlie Lauland, and foreman Anthony Knecht were part of a three-man switching crew in the NOPB's Cotton Warehouse yard.[7] That morning, the crew set out to move railcars from track 18 to track 20.[8] This required Hughes to "line" switch 18.[9] And to line switch 18, Hughes had to operate a YM-16 electrical hydraulic switch machine (a "YM-16 machine").[10] A YM-16 machine uses hydraulic power to line a switch, as opposed to traditional switches, which require the switchman to manually line the switch.[11] The NOPB submits that the YM-16 machines can line a switch in any one of four ways.[12] Three of those are "power" options: (1) programming switch maneuvers through an electronic input from the NOPB's yard office; (2) using a particular radio code transmitted from a handheld radio; or (3) pressing a button on the YM-16 switch stand machine itself.[13] The final method by which one can line a switch using a YM-16 machine is by manually pumping the hydraulic lever on the switch stand machine.[14]

According to Hughes, before he operated the YM-16 machine attached to switch 18, he observed that one of the lights on the machine was blinking red.[15] Hughes understood the flashing

---

[6] R. Docs. 42-1 at 2; 43 at 2.
[7] R. Docs. 42-1 at 2; 43 at 2.
[8] R. Docs. 42-1 at 2; 43 at 2.
[9] R. Doc. 42-1 at 2. A railroad "switch" is a mechanical device that guides trains from one track to another. When a switchman "lines a switch," he ensures the track is positioned to guide locomotives and railcars onto the intended track. *See id.*
[10] *Id.* at 2, 5; R. Doc. 43 at 2.
[11] R. Docs. 42-1 at 5; 43 at 4.
[12] R. Doc. 42-1 at 5-6.
[13] *Id.* at 5-6, 10.
[14] *Id.* at 6.
[15] R. Doc. 43 at 2. The parties disagree about the meaning of the blinking red light. Hughes says that the blinking red light indicated to him that the YM-16 machine's automatic hydraulic feature was not operative. *Id.* The NOPB submits that the flashing red light does not indicate whether or not the YM-16 machine has power; it only signals to the switchman that he cannot use one of the "power" options for any one of a number of possible reasons and instead must throw the switch manually. R. Doc. 42-1 at 10. However, both parties agree that when the red light appears, the switch must be thrown manually, regardless of the reason why.

red light to mean that he had to line the switch manually, so he lined the switch that morning by using the hydraulic lever on the YM-16 machine.[16] When he did, he found that switch 18 "was unusually and extremely hard to line" when compared to his experiences manually lining switches on other occasions where he had not utilized a "power" option on the YM-16 machine.[17] Hughes approximates that he pumped the machine 12-15 times before the switch was lined.[18] While pumping the machine, Hughes felt a "pop" in his right shoulder, followed by pain in the area.[19] Hughes says he was diagnosed with two tears in his right shoulder as a result of the incident.[20]

Hughes filed the present lawsuit on June 19, 2024, alleging that the NOPB breached its duty under FELA to provide a reasonably safe work environment and claiming damages for past and future physical pain and suffering; past and future mental anguish; past and future loss of enjoyment of life; past and future loss of wages, earning capacity, and fringe benefits; past and future unpaid medical expenses; and permanent scarring.[21]

## II. PENDING MOTION

In its motion, the NOPB argues that it is entitled to summary judgment on Hughes's claim because Hughes cannot show a genuine dispute of material fact as to two essential elements of his FELA claim: (1) whether the NOPB breached its duty to provide a reasonably safe work environment, and (2) whether it was foreseeable to the NOPB that Hughes would find that switch 18 was hard to throw.[22] First, the NOPB says that Hughes does not show that the NOPB's implementation of the YM-16 machines, and the resulting requirement that employees would

---

[16] R. Doc. 43 at 3.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] R. Doc. 1 at 5.
[21] *Id.* at 5-10.
[22] R. Doc. 42-1 at 14-23.

sometimes have to manually operate the hydraulic switches, created an unsafe workplace.[23]  It submits that its duty to provide a safe work environment does not require it to provide the safest possible work environment, and that even if the YM-16 machines are more difficult to operate manually than the hand-thrown switches the NOPB had used before, they do not create an unsafe work environment.[24]  Second, it argues that Hughes does not meet his summary-judgment burden on the issue of foreseeability because he does not establish that the NOPB had actual or constructive notice of the condition at issue.[25]  Further, it points to three inspections of the YM-16 machine – one performed by CDL Electric Company, LLC ("CDL"), a third-party electrical contractor, two days before Hughes's alleged injury; one performed by Hughes immediately before operating the switch; and one performed by the NOPB after the incident – that revealed no defects in the YM-16 machine, contending that these inspections revealed nothing that would give the NOPB notice of a defect.[26]

In his opposition, Hughes argues that there are factual disputes regarding the NOPB's negligence that preclude summary judgment and that the NOPB had notice that the YM-16 machines were difficult to operate manually.[27]  Regarding the NOPB's negligence, Hughes submits that jurors could infer that the NOPB was negligent from several pieces of circumstantial evidence, including: (1) documents reflecting a reduction in the number of hours billed to the NOPB by CDL for maintenance and inspection work in April 2023, the month before Hughes's injury, when compared to the three months prior; (2) testimony that Joshua Steward, a CDL employee, was required to spend two hours inspecting and performing maintenance on each YM-

---

[23] *Id.* at 14-18.
[24] *Id.* at 15-18.
[25] *Id.* at 18-23.
[26] *Id.* at 20-24.
[27] R. Doc. 43 at 14-23.

16 machine serviced the week of Hughes's accident, when there is evidence that such inspection and maintenance should only have taken five minutes per switch, if the switch were not defective; (3) the absence of any record of the inspection and maintenance work performed on the YM-16 machine associated with switch 18 for the 30 days preceding Hughes's injury; (4) testimony and records reflecting that the NOPB had notice that its employees found the YM-16 machines difficult to operate; and (5) testimony that NOPB employees found YM-16 machines difficult to operate.[28] Then, regarding the issue of foreseeability, Hughes asserts that three pieces of evidence support a finding that the NOPB had notice that the YM-16 machines were hard to throw: (1) an NOPB Safety Turnover Sheet from July 2021; (2) the declaration of Eddie J. Logan, III, a longtime NOPB employee; and (3) the deposition testimony of CDL, which had a maintenance contract with the NOPB, thus, according to Hughes, making it an agent of the NOPB.[29]

In its reply, the NOPB first offers purported clarifications to certain pieces of Hughes's evidence.[30] Next, the NOPB argues that the foreseeability standard, correctly understood, requires the plaintiff to show that the "'railroad knew, or by the exercise of due care should have known that its conduct was inadequate to protect the plaintiff.'"[31] Then it maintains that under that standard, Hughes cannot prove the foreseeability of his injury.[32]

### III.  LAW & ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[28] *Id.* at 8-9, 21-23.
[29] *Id.* at 16-17.
[30] R. Doc. 44 at 1-6.
[31] *Id.* at 6-7 (quote at 6) (quoting *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 417 (5th Cir. 2012)) (internal quotation marks and alteration omitted).
[32] *Id.* at 8-9.

any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*,

6

572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. FELA Standard

Under FELA, a railroad employee may recover damages for "injury or death resulting in whole or in part from the negligence" of the railroad company. 45 U.S.C. § 51. "FELA provides the exclusive remedy for a railroad employee engaged in interstate commerce whose injury resulted from the negligence of the railroad." *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 416 (5th Cir. 2012) (citing *Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004)). To prevail under FELA, "a plaintiff must prove: (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) he was employed by the defendant with duties advancing such

commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." *Johnson v. Clark Gin Serv., Inc.*, 2017 WL 2123846, at *8 (E.D. La. May 12, 2017) (quoting *Weaver v. Mo. Pac. R.R. Co.*, 152 F.3d 427, 429 (5th Cir. 1998)). A railroad has a duty under FELA to provide its employees with a reasonably safe work environment. *McCormick v. New Orleans Pub. Belt R.R. Comm'n*, 2017 WL 2267204, at *2 (E.D. La. May 24, 2017) (citing *Huffman*, 675 F.3d at 417). It breaches its duty if it "'knew, or by the exercise of due care should have known' that its conduct was 'inadequate to protect the plaintiff and similarly situated employees.'" *Huffman*, 675 F.3d at 417 (alteration omitted) (quoting *Urie v. Thompson*, 337 U.S. 163, 178 (1949)). The standard of care is that of "ordinary prudence under the circumstances." *Id.* at 418 (citing *Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 338-39 (5th Cir. 1997) (en banc)).

A FELA plaintiff must prove the traditional elements of negligence, *i.e.*, duty, breach, causation, and damages. *Johnson*, 2017 WL 2123846, at *8-9. "'Reasonable foreseeability of harm' … is … 'an essential ingredient of FELA negligence.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011) (emphasis and alteration omitted) (quoting *Gallick v. Balt. & Ohio R.R. Co.*, 372 U.S. 108, 117 (1963)). Therefore, if a railroad company would have "'no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then the [railroad company] is not required to do anything to correct the condition.'" *Id.* (alterations omitted) (quoting *Gallick*, 372 U.S. at 118 n.7). FELA departs from the traditional principles of negligence by relaxing the standard of causation. *McCormick*, 2017 WL 2267204, at *2. "Under FELA, 'a defendant railroad caused or contributed to a railroad worker's injury if the railroad's negligence played a part – no matter how small – in bringing about the injury.'" *Huffman*, 675 F.3d at 417 (internal quotation marks and alteration omitted) (quoting *CSX Transp.*, 564 U.S. at

8

692); *see Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957). If this "very low" causal standard is shown, *McCormick*, 2017 WL 2267204, at *2, then the railroad is "answerable in damages even if 'the extent of the injury or the manner in which it occurred' was not 'probable' or 'foreseeable.'" *CSX Transp.*, 564 U.S. at 704 (alteration omitted) (quoting *Gallick*, 372 U.S. at 120-21 & n.8). Importantly, a jury has "significantly broader" power to engage in inferences in FELA cases than in other negligence actions, *Howard v. Canadian Nat'l/Ill. Cent. R.R.*, 233 F. App'x 356, 357-58 (5th Cir. 2007), and may even "infer causation from unexplained events." *Rivera*, 378 F.3d at 510 (quoting *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994)).

"Due to the liberal construction and interpretation of FELA claims, a plaintiff's FELA claim should only be dismissed on summary judgment 'when there is a complete absence of probative facts supporting the plaintiff's position." *McCormick*, 2017 WL 2267204, at *3 (quoting *Howard*, 233 F. App'x at 357-58). The plaintiff's burden of proof under FELA is "featherweight" and stands in contrast to that in other civil cases in which "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Howard*, 233 F. App'x at 357 (quotation omitted). In part, FELA was enacted "to secure jury determinations in a larger proportion of cases than would be true of ordinary common law actions." *Id*. In other words, "trial by jury is part of the remedy in FELA cases." *Id.* (quotation omitted); *see also Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 360 (1962).

### C. Analysis

In the present case, the NOPB is not entitled to summary judgment because Hughes has presented sufficient evidence regarding whether the NOPB provided a reasonably safe work environment and whether it knew or should have known that its conduct was inadequate to protect its employees.

The NOPB first argues that its duty was merely one to refrain from creating an unsafe workplace – not one to create the safest possible workplace. It says that, even if the YM-16 machines are harder to operate than the traditional switches they replaced, Hughes does not show that requiring employees to manually operate the YM-16 machines created an unsafe workplace. However, Hughes's claim is not simply that the YM-16 machines were more difficult to manually operate than the mechanisms previously in their place. The claim is that the YM-16 machines were so difficult to operate manually they posed a danger to employees and that Hughes received an injury while manually operating one.[33] And there are at least three pieces of evidence indicating that the NOPB had notice that the YM-16 machines were so difficult to manually operate.

First, Hughes testified in his deposition that he complained to supervisors in the railyard about the difficulty operating the YM-16 machines.[34] Second, Logan, another longtime NOPB employee, testified that he "reported complaints regarding the physical exertion required to manually operate the [YM-16 machines] to NOPB managers," and that employees were frequently required to operate the YM-16 machines manually.[35] Third, an NOPB Safety Turnover Sheet from July 2021 indicates that the NOPB received and documented evidence that the YM-16 machines were difficult to operate manually.[36] Specifically, the Safety Turnover Sheet shows that in July 2021, shortly after the NOPB replaced its hand-thrown switches with the YM-16 machines, the NOPB received and documented a report that, when employees manually operated the YM-16 machines, the switches were difficult to throw, resulting in aches to the employees.[37] In a column titled "Reported Item Requiring Action," the document reads: "power switches at CWH [Cotton

---

[33] R. Doc. 1 at 4.
[34] R. Doc. 43-1 at 196-97.
[35] R. Doc. 43-7 at 1-2 (quote at 2).
[36] R. Doc. 43-8 at 2.
[37] *Id.*; R. Doc. 43 at 5.

10

Warehouse] need power. They are extremly [sic] hard to throw and also crews are complaining of excessive throwing of the switches causing aches."[38] On the same report, there are two columns titled "Action Taken" and "Item Completed."[39] The boxes in those columns that correspond to the report that the switches were difficult to throw both remain empty, which could be read as indicating that the NOPB never acted on or resolved the complaint in the report.[40] From these three pieces of evidence, one could conclude that the NOPB knew its employees had a difficult time manually operating the YM-16 machines (to the point that they experienced physical pain) but did nothing about it.

To be sure, the NOPB points to no evidence that it remedied such complaints. Nonetheless, it does cite to other evidence in an effort to explain or contextualize Hughes's summary-judgment evidence.[41] But this simply places these material facts in dispute. From the record, then, a reasonable juror could conclude that the NOPB's failure to remedy or investigate known complaints made the workplace unsafe – or, in other words, was a breach of the NOPB's duty under FELA.

The NOPB also argues in its reply that there is no genuine dispute of material fact regarding whether it created an unsafe work environment because "[t]here is no evidence from which a jury can infer a defect" in the YM-16 machine.[42] However, Hughes testified that he had to pump the hydraulic lever on the YM-16 machine approximately 12-15 times to line switch 18 on the morning of May 17, 2023.[43] And there is evidence in the record that a properly functioning YM-16 machine need be pumped only 6-10 times.[44] From this evidence, a jury can infer a defect in the YM-16

---

[38] R. Doc. 43-8 at 2.
[39] *Id.*
[40] *Id.*
[41] R. Doc. 44.
[42] *Id.* at 10.
[43] R. Doc. 42-2 at 8.
[44] R. Doc. 42-6 at 2-3.

machine. The Court fully recognizes that the NOPB has countervailing evidence, which a jury may in the end find persuasive. But, again, at this juncture, this evidence simply creates a factual dispute, and nothing more.

The NOPB's second argument, that it is entitled to summary judgment because Hughes's injury was not foreseeable, also fails. First, as this Court has explained, Hughes has produced evidence indicating that the NOPB had notice that the YM-16 machines were difficult to operate manually. Second, the NOPB's argument that Hughes's injury was not foreseeable because several different inspections concluded that the YM-16 machine associated with switch 18 was in proper working order also cannot prevail on summary judgment. The NOPB points to three inspections: one performed by CDL two days before Hughes's alleged injury, one performed by Hughes immediately before operating the switch, and one performed by the NOPB after the incident. But there is no undisputed evidence that these inspections addressed the issues presented in the Safety Turnover Sheet and in its employees' complaints: that the switch was so hard to throw it posed the risk of injury.

To be sure, CDL, an electrical contractor, conducted monthly inspection and maintenance on the YM-16 machines because of the number of electrical components involved in the machines.[45] CDL's corporate representative testified that during the inspections of the YM-16 machines, CDL inspects the switches in the same manner that it would inspect a power switch – by first notifying and obtaining permission from those who might remotely operate the switch, and then testing multiple electrical features of the switch – as well as by testing "the hand pumping technique to verify that the hand pumps between [either six or] seven to ten pumps … per pump to get to each side."[46] Without explaining more about the ambit and function of CDL's inspections

---

[45] R. Doc. 42-1 at 8; R. Doc. 43-1 at 4.
[46] R. Doc. 42-6 at 2-3.

of the manual operation of the YM-16 machines, it cannot be said that these inspections indisputably addressed – much less resolved – the concerns raised in the employees' complaints that the YM-16 machines were inordinately difficult to operate manually. Further, the evidence about Hughes's inspection of the switch is inconclusive, and in any event, the Court is doubtful that the results of such inspection have any bearing on whether the NOPB had notice of any defect. Finally, the Court does not see how the NOPB's post-hoc inspection of the switch, after the incident, has any meaningful relevance to the issue of foreseeability.

The summary-judgment burden under the FELA is "featherweight." Because there is some evidence, even if scant, that the NOPB had been made aware of its employees' complaints about the difficulty of manually operating the YM-16 machines, and did not take proper remedial action, Hughes meets his summary-judgment burden.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the NOPB's motion for summary judgment (R. Doc. 42) is DENIED.

New Orleans, Louisiana, this 16th day of January, 2026.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE